[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

NO. 06-16493

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 1, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 05-01575 CV-ODE-1

R.A. MCELMURRAY, III,
G. WILLIAM BOYCE, DAVID L. LEWIS,

Plaintiffs-Appellants,

UNITED STATES OF AMERICA EX REL,

Plaintiff,

versus

THE CONSOLIDATED GOVERNMENT OF
AUGUSTA-RICHMOND COUNTY,

Defendant-Appellee,

AUGUSTA, GA,

Movant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 1, 2007)**

Before EDMONDSON, Chief Judge, CARNES and FAY, Circuit Judges.

FAY, Circuit Judge:

Appellants R.A. McElmurray, III and G. William Boyce, two dairy farmers, and David Lewis, a Research Microbiologist ("Appellants"), filed this lawsuit pursuant to the False Claims Act ("FCA"), against Appellee, the Consolidated Government of Augusta-Richmond County ("Augusta")[1] alleging that Augusta violated the FCA by knowingly misrepresenting its compliance with state and local environmental laws in order to obtain Government loans. Appellants raise two issues. The first claim is that the district court erred by *sua sponte* converting Augusta's Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim into a Fed. R. Civ. P. 12(b)(1) motion for lack of subject matter jurisdiction and dismissing the lawsuit prior to any discovery. Because the district court treated the Fed. R. Civ. P. 12(b)(1) motion as a "facial" challenge to the court's jurisdiction, rather than a "factual" challenge, we affirm this portion of the district court's decision and agree that discovery was not necessary.

Appellants' next claim is that the district court erred in holding that they were not the original source of the information supporting their claim under the

---

[1] The Consolidated Government of Augusta-Richmond County is the successor by consolidation to the City of Augusta, a municipal corporation.

FCA. Because we find that Appellants' allegations of fraud on the loans that Augusta sought from the Government are based upon public documents and disclosures, we also affirm the district court's decision that Appellants were not the original source of the information as is required under the FCA.

## I. FACTUAL BACKGROUND

Augusta owns and operates the Butler Creek Water Pollution Control Plant ("Butler Creek Plant") and its predecessor and now sub-component, the Messerly Wastewater Treatment Plant ("Messerly Plant") in Augusta, Georgia.[2] Appellants McElmurray and Boyce allowed Augusta to apply sewage sludge from the Butler Creek and Messerly Plants on their lands. They later noticed that significant adverse effects, such as excessively high mortality rates, developed in their dairy herds.

The Environmental Protection Division of the Georgia Department of Natural Resources ("Georgia EPD") regulates the volume and contents of effluent in the state from each plant by requiring them to obtain a National Pollution

---

[2] These facts are summarized from and provided in further detail in the district court's order. In order to maintain consistency, we utilize the district court's citations regarding exhibits. *See United States of America, ex rel. R.A. McElmurray, III, G. William Boyce, and David L. Lewis v. The Consol. Gov't of Augusta-Richmond County*, 464 F.Supp.2d 1327 (N.D. Ga. 2006).

Discharge Elimination System ("NPDES") permit before they can discharge into public waters.[3]

For many years, the Messerly Plant has processed Augusta's municipal wastewater. The Messerly Plant first experienced problems with its treatment of wastewater in the 1970s, which resulted in chronic violations of its NPDES permits. By the early 1990s, a series of Georgia EPD Administrative Orders and Consent Decrees had been issued against the Messerly Plant, requiring compliance with its NPDES permits. On May 11, 1994, Augusta informed the Georgia EPD of a long term plan it was implementing in order to achieve compliance with its NPDES permits.[4] Two years later, as part of its long term plan, Augusta had begun construction on a construed wetlands system for nitrogen removal and effluent polishing, but it was obvious to the Georgia EPD that until the wetlands were completed the Plant would continue to discharge effluent over the set limits. Therefore, the Georgia EPD established more relaxed discharge levels and in a Consent Order required Augusta to complete Phase II of the wetland system by October 1, 2000. However, Augusta failed to meet even these new, lower standards.

_____

[3] Among other things, NPDES permits set requirements for the monitoring and disposal of sewage sludge.

[4] As of 1996, the Messerly Plant and its adjacent wetlands collectively became known as the Butler Creek Plant for administrative purposes. *See* Exhibit 11-5 at EPD 04783.

As a result, the Georgia EPD audited the facilities during the week of December 7, 1998, and discovered that there had been little improvement at the plants since 1977,[5] concluding that "the Butler Creek Plant is in immediate need of a strong Capital Improvement Plan that sets firm schedules for the evaluation and installation of necessary plant equipment." Exhibit 2-36 at CO 0556.[6] In January 2001, a new NPDES permit returned the Butler Creek Plant to its pre-1998 discharge levels. Nonetheless, despite changes, the Plant violated the effluent limitations of this permit numerous times between 2001 and 2003, and as a result of these violations, was required to pay monthly fines imposed by the Georgia EPD.

Augusta not only experienced problems with the Butler Creek Plant, the Spirit Creek Plant also released effluent that was impermissibly high at least twice: in January 2002 and in September 2004.[7] Augusta also suffered several sewer failures that resulted in unauthorized discharge of contaminants into public waters, for which it was fined in September 2002 and June 2003. *See* Exhibit 2-69, 2-78.

---

[5] The Georgia EPD noted that the Plant was "deficient in several important areas" which "when considered comprehensively show a dramatic deterioration in Plant performance, maintenance and management." Exhibit 2-36 at CO 0566.

[6] The Georgia EPD then closely monitored Augusta's compliance with its NPDES permit and existing Consent Orders and proposed and imposed other Consent Orders to enforce the requirements set forth in the NPDES permits. *See* Exhibits 2-42, 2-43, 2-44, 2-45.

[7] By 2003, the Spirit Creek Plant was subject its own Consent Order under which Augusta was fined $2,000 for each month the Spirit Creek Plant violated its NPDES permit effluent limitations.

In addition to the Georgia EPD, other organizations noticed Augusta's poor environmental record. Apart from Appellants' own individual lawsuits against Augusta for contaminated sludge, the Georgia Environmental Organization, Inc. brought a citizen suit against the City of Augusta, Augusta's predecessor, for violations of the Clean Water Act. *See* Exhibit 18.

Even with the strict monitoring and management requirements imposed on Augusta's facilities, it also failed the Georgia EPD's expectations with respect to its Industrial Pretreatment Program.[8] After these problems became apparent in the late 1980s and early 1990s, the Georgia EPD, along with other environmental experts, turned their attention to the plants' program for disposal of sewage sludge by land application.[9] In December 1998, when conducting an audit of the Messerly Plant, the Georgia EPD noticed that a direct relationship existed between the poor management of the Industrial Pretreatment Program at the Messerly Plant and the

---

[8] In 1978, the Georgia EPD informed Augusta that the Messerly Plant's monitoring of industrial wastes was "insufficient." Exhibit 3-1 at ARC 00910. After its December 1998 audit of the entire Messerly Plant, the Georgia EPD noted that there was "marginal implementation and administration of the Pretreatment Program." Exhibit 16 at GCL 00048. In 1999 the Georgia EPD audited the Messerly Plant's Industrial Pretreatment Program as a follow-up to its facility-wide audit in 1998 and concluded that the Plant's Industrial Program was "in significant non-compliance" with federal and state pretreatment regulations. Exhibit 3-3 at EPD 15359.

[9] In 1980, Augusta adopted land application as its disposal method for the sludge generated by its wastewater treatment plants. The NPDES permits for the Messerly Plant and the Butler Creek Plant have contained provisions for sludge disposal since at least 1982. In all NPDES permits for the Messerly Plant from 1982 to the present, the Georgia EPD requires the Plant to dispose of its sludge in accordance with the Clean Water Act and the Resource Conservation and Recovery Act of 1976 as well as EPA guidelines.

high concentration of contaminants in the sewage sludge the facility generated. [10]

Thus, the Georgia EPD concluded that the Messerly Plant's land application program was in violation of Georgia EPD regulations and the Plant's NPDES permits. After making these discoveries, the Georgia EPD recommended that "the land application program [should] be shutdown immediately and . . . remain down until the Pretreatment Program has been brought up to speed." Exhibit 16 at GCL 00050. In addition, the Georgia EPD stated that "in the future, the City should not be allowed to land apply sludge" and "a reliable contract operator" should be hired instead to run the land application program. *Id.*

After representing to the McElmurray and Boyce families that the sewage sludge was a completely safe and beneficial fertilizer, Augusta was permitted to apply the sewage sludge from the Messerly Plant onto the families' farmlands from 1979 to 1990 and from 1986 to 1996, respectively. When Appellants noticed that significant adverse effects, such as excessively high mortality rates, developed in their dairy herds, they contacted each other and began to investigate the cause

---

[10] The Georgia EPD had long before noted in the Plant's NPDES permit that uncontrolled flow of untreated wastewater from industrial users causes contamination of municipal sludge. *See* Exhibit 11-3 at ARC 05823. As part of the December 1998 audit, the Georgia EPD discovered a high level of sulfides in the sludge generated by the Messerly Plant and observed that the sludge was "highly corrosive . . . to the point that the sludge cannot be applied up to the fence lines because it will rust the barbed wire fences." Exhibit 16 at GCL 00049.

7

of such effects.  After investigation, Appellants established that a causal link existed between the damage to their cattle farms and the applications of sewage sludge by Augusta.[11]  Appellants filed separate lawsuits against Augusta alleging that the sewage sludge used as fertilizer on their land contained hazardous chemical wastes that resulted in the deaths of their dairy cattle.[12]

Appellants brought this claim under the FCA[13] alleging that Augusta committed fraud in misrepresenting its compliance with environmental laws in order to receive Georgia Environmental Facilities Authority (GEFA) loans, which originated from the Environmental Protection Agency (EPA).[14] Appellants claim that Augusta obtained the three GEFA loans in violation of the FCA by knowingly making false statements and false claims in the loan applications and other

---

[11] Appellants fed their cattle home-grown silage, grown on the same lands on which Augusta was applying the sewage sludge from the Messerly Plant.

[12] In June 2003, Boyce received a favorable jury verdict in the Superior Court of Richmond County Georgia, confirming that Augusta was in violation of state and federal laws. Apparently, McElmurray's case has not been resolved.  *See McElmurray v. Augusta-Richmond County*, 618 S.E.2d 59 (Ga. Ct. App. 2005).

[13] 31 U.S.C. § 3729(a)(West 2007) provides that "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" is "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . ."

[14] The district court order describes in detail each loan. *See United States of America, ex rel. R.A. McElmurray, III, G. William Boyce, and David L. Lewis v. The Consol. Gov't of Augusta-Richmond County*, 464 F.Supp.2d 1327, 1335-39 (N.D. Ga. 2006).

documents.[15]  Augusta filed a motion to dismiss on March 29, 2006 arguing that:

(1) Appellants' claims are barred by the FCA's statute of limitations; (2)

Augusta's alleged false certifications of compliance with environmental laws were

not "material" to GEFA's approval of the loans; (3) Appellants' claims are based

upon public disclosures and Appellants are not the original source; (4) Appellants

failed to plead fraud with particularity; and (5) Appellants do not allege that the

Government has suffered any cognizable damages.  The district court granted

Augusta's motion to dismiss based upon the third argument alone, finding that

Appellants' claims were based upon public disclosures and that they were not the

original source of the information on which their loans were based.  This appeal

followed.

## II. STANDARD OF REVIEW

In reviewing the district court's decision to grant the motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(1), lack of subject matter jurisdiction, this Court

reviews the legal conclusions of the district court *de novo*.  *See S.E.C. v. Mutual*

*Benefits Corp.*, 408 F.3d 737, 741 (11th Cir. 2005).

## III. DISCUSSION

---

[15] It would appear from the Appellants' exhibits that if anyone had taken the time to read any of these numerous public records it would have been obvious that Augusta filed false certifications with its loan applications.

A. *The District Court Did Not Err in Dismissing the Complaint for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) Without First Permitting the Parties to Conduct Discovery.*

The FCA states that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A)(West 2007). Because the district court correctly ruled that the Appellants' claims were based upon public disclosures and that the plaintiffs were not the original source of the information upon which they relied, we agree that the district court lacked subject matter jurisdiction.

According to *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981),[16] a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint. If the challenge is facial, "the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised." *Id.* Accordingly, "the court must consider the allegations in the plaintiff's complaint as true." *Id*.

---

[16] *See Bonner v. Prichard*, F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in the Eleventh Circuit, all decisions of the former Fifth Circuit announced prior to October 1, 1981).

A "facial attack" on the complaint "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980)). "'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered.'" *Id.* Furthermore, in *Williamson,* the former Fifth Circuit held that "[t]he district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson*, 645 F.2d at 413. A review of the record indicates that the district court here treated the motion to dismiss as a facial attack and considered only the complaint and the attached exhibits.

The district court did not decide any issues of disputed fact. It accepted all of plaintiffs' allegations in the complaint as true, and determined that it lacked subject matter jurisdiction because plaintiffs were not an "original source."

11

Discovery was not necessary.[17] *See id.* at 414 (stating that in a *factual challenge* the district court *must* give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss) (emphasis added).

B. *Plaintiffs/Appellants Are Not the Original Source of Publicly Disclosed Information Upon Which Their Claims are Based*

The FCA does not allow jurisdiction over *qui tam* actions that are based on publicly disclosed information unless brought by the Attorney General or a person who is an original source of the information. *See* 31 U.S.C. § 3730(e)(4)(A)(West 2007). Section 3730(e)(4)(B) defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." This Court has condensed section 3730(e)(4) into a three part inquiry to determine if subject matter jurisdiction over a *qui tam* FCA claim exists: "(1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed

---

[17] In a recent decision, the United States Supreme Court held that Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to "some claim." *See Rockwell International Corp. v. U.S.*, 127 S.Ct.1397, 1410 (2007). Therefore, though Appellants are probably an original source with respect to the damage allegedly caused to their cattle by Augusta, they are not an original source with respect to the false certifications of Augusta on the loan documents, and thus they cannot attach jurisdiction over the latter based on the former.

12

information the basis of the plaintiff's suit; (3) if yes, is plaintiff an 'original source' of that information." *Battle v. Board of Regents,* 468 F.3d 755, 762 (11th Cir. 2006) (quoting *Cooper v. Blue Cross and Blue Shield of Florida*, 19 F.3d 562, 565 n.4 (11th Cir. 1994)).

Appellants contend that there was no public disclosure of Augusta's alleged false claims. They contend that their federal lawsuits prompted the December 1998 audit and the diagnostic evaluation of the sludge facilities conducted by the EPA. Morever, they argue that the exhibits to the complaint fully support their original source status, and that without their research, the public would have never known about Augusta's misconduct.

Augusta argues that Appellants have used publicly disclosed information as the basis of their complaint, specifically the reports prepared by the Georgia EPD, and information derived from discovery in cases filed in the Superior Court of Richmond County and the Southern District of Georgia. *See* Appellate Brief for Augusta at 9-10. In addition, Augusta argues that Appellants are not the original source of the information on which they base their complaint because they have neither direct nor independent knowledge of the publicly disclosed information. Augusta asserts that the allegations in the complaint along with the exhibits reveal clearly that the information Appellants have about Augusta's alleged false claims

13

came from the Georgia EPD or through documents filed in other civil litigation. Thus, Augusta argues that Appellants can make no claim that they voluntarily provided any information relied on by the Georgia EPD or EPA as required to be an original source. In essence, Augusta argues that Appellants have just compiled documents or reports already in the public domain.

Appellant Lewis, serving as an expert, reviewed documents and information uncovered during discovery in Appellant McElmurray and Appellant Boyce's individual lawsuits. Such cannot be the basis of this suit. In addition, in a whistle blower case that Lewis filed himself involving the EPA and one of the companies that applied Appellee's sewage sludge, Appellant Lewis uncovered more relevant documents and information through discovery. These are also public disclosures.

Using the same grouping as the district court, we have reviewed the exhibits attached to the complaint.[18] Exhibits 4, 5, 6, 7, and 10 are affidavits, expert reports, and statements that were filed as part of Appellants' individual lawsuits against Augusta filed in the Superior Court of Richmond County regarding the alleged harm to their cattle as a result of the Augusta's land application of the

---

[18] We follow the district court's analysis that the exhibits fall into four general categories: (1) information submitted to another court as part of prior litigation (see Exhibits 4, 5, 6, 7, and 10); (2) information apparently disclosed as part of discovery in prior litigation (see Exhibits 2, 3, 8, 9, 11, 16, and 17); (3) orders issued by other courts in previous suits against Defendant-Augusta (see Exhibits 15, 18, and 19); and (4) information obtained by Relators-Appellants in order to file this litigation (see Exhibit 1).

contaminated sludge.  We agree that documents filed with the court, such as these, are public disclosures under the FCA as part of a "civil hearing."  *See United States ex rel Butler v. Magellan Health Serv., Inc.*, 74 F.Supp.2d 1201, 1208 (S.D. Fla. 1999); *see also U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 652 (D.C. Cir. 1994).

We also consider Exhibits 2, 3, 8, 9, 11, 16, and 17 to be public disclosures under the FCA because they were all apparently disclosed to Appellants during the discovery phase of their individual lawsuits against Augusta, and discovery materials are public disclosures under the FCA.[19]

Furthermore, Exhibits 2, 3, 16, and 17 are reports and notifications prepared by the Georgia EPD.  These are administrative reports pursuant to section 3730(e)(4)(A), and this Court has stated that "the FCA is most naturally read to preclude suits based *in any* part on publically disclosed information."  *Battle*, 468 F.3d at 761 (citing *Cooper,* 19 F.3d 562, 565 n.4.).  Thus, these documents cannot be the basis of a suit under the FCA.

Exhibits 15, 18, and 19 are also public disclosures under the FCA.  These

---

[19] The United States Circuit Court of Appeals for the Third Circuit construed Section 3730(e)(4)(A)'s language regarding "the public disclosure of allegations or transactions in a . . . civil . . . hearing" to mean that discovery material disclosed "to a party who is not under any court imposed limitation as to its use" is a public disclosure.  *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1158 (3d Cir. 1991).  We agree.

exhibits include a copy of the 2003 judgment in Appellant Boyce's individual lawsuit against Augusta; a copy of the District Court for the Southern District of Georgia's Order granting plaintiff Georgia Environmental Organization Inc.'s motion for summary judgment in its lawsuit against Augusta; and a copy of a 1997 consent decree granted by the District Court for the Southern District of Georgia upon plaintiff Georgia Environmental Organization Inc.'s motion for entry of consent decree. By definition, these court orders are public records.

Furthermore, Exhibit 1 comprises copies of the Environmental Services Contracts, promissory notes, and an activity statement for Augusta's 1992, 1994, and 1996 GEFA Loans. It is not evident from the exhibits how they were obtained, but the documents contain all the information cited in the complaint regarding terms and conditions of the three GEFA loans, the dates of disbursement of funds under the loans, and the current repayment status of the loans. We agree with the district court that these documents in Exhibit 1 were apparently obtained as part of discovery in Appellants' individual lawsuits against Augusta, because they have so implied in their complaint. We further agree that if these documents were acquired during discovery in previous lawsuits, then they constitute a "public disclosure" under section 3730(e)(4)(A). They are also clearly public records. Thus, Exhibit 1 cannot be the basis of a suit under the FCA.

16

In *Battle*, this Court stated that if "a plaintiff [is] basing an FCA *qui tam* claim in any part on . . . publicly disclosed information [the plaintiff] must demonstrate that the plaintiff is an original source of that information." *Battle*, 468 F.3d at 762. Even though, in *Battle*, this Court stated that "the FCA does not impose a strict tracing rule that would require the relator to trace the allegations from the disclosing agency back through the government bureaucracy to the relator," *id.* (citing *Cooper*, 19 F.3d at 568 n. 13), "the FCA mandates that, to qualify as an original source, a plaintiff must have direct and independent knowledge of the information on which the allegations are based." *Id.* "In other words, a plaintiff need not establish herself as *the* original source of the publicly disclosed information but must establish that she is *an* original source of the information in that she had direct and independent knowledge of the information on which she is basing her FCA claim." *Id.* (emphasis in original). Appellants make no such claim. Appellants allege that they obtained the information on which they base their complaint from publicly disclosed documents. The fact that this background knowledge of Augusta's environmental violations enabled them to understand the significance of the information they acquired in their individual lawsuits against Augusta does not mean that they had knowledge independent of the publicly disclosed information as to the certifications alleged to be false.

Therefore, Appellants have not been able to satisfy the requirements of section 3730(e)(4)(A) and section 3730(e)(4)(B).[20]

## IV. CONCLUSION

There was no error in the district court ruling on the motion to dismiss without and prior to any discovery and because Appellants cannot qualify as an "original source" under the law controlling *qui tam* actions, we

**AFFIRM.[21]**

---

[20]Assuming that Appellants were probably an original source of information regarding the fact that the sludge being applied to their land was causing great harm to their cattle does not equate with being an original source of information regarding the fact that Augusta was making false statements in its loan applications.

[21] In affirming the dismissal of this action, we do not condone what may have been misconduct by certain officials of Augusta.