[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13797

_____

JANEMARIE CRIDER,

TUCKER ANDERSON,

Plaintiffs-Appellees,

*versus*

ANITA WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
Docket No. 2:20-cv-01518-SGC

_____

Before JORDAN and ROSENBAUM, Circuit Judges, and SCHLESINGER,[*] District Judge.

PER CURIAM:

Plaintiffs-Appellants Janemarie Crider and Tucker Anderson (together, "Parents") appeal the district court's grant of qualified immunity to Defendant-Appellee Anita Williams, a social worker who allegedly lied to Alabama and Tennessee courts to obtain jurisdiction necessary to remove the Parents' child from them. The Parents also appeal the district court's ostensible decision to decline supplemental jurisdiction over their state-law claims against Williams.

After careful consideration of the record and with the benefit of oral argument, we conclude that the Parents' complaint sufficiently alleges clearly established violations of Fourteenth Amendment procedural-due-process rights and the Fourth Amendment right to be free from malicious prosecution, and that the district court had original diversity-of-citizenship jurisdiction over the Parents' state-law claims, so declining supplemental jurisdiction over them wasn't an option. For these reasons, we vacate and remand for further proceedings.

---

[*] The Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

## I. [1]

The Parents have a minor child (the "Child") born in 2015 in Knoxville, Tennessee, where the Parents lived. Around January 25, 2016, the Parents and the Child traveled to Blount County, Alabama, for an extended stay with Anderson's mother in her guest home.

Several weeks later, on March 18, 2016, the Blount County Department of Human Resources ("BCDHR") received a report that the Parents were smoking marijuana and had been arrested before on drug charges. Williams, an investigator with the Alabama Department of Human Resources, went to Anderson's mother's home the same day, to look into the allegations. After speaking with the Parents and seeing the Child, Williams recorded in her notes that the Child had no obvious bruises and appeared healthy. She also noted that, according to Anderson, the Parents lived in Tennessee but had been in Alabama for about three to four months.

Five days after Williams's visit, on March 23, the Parents went back to Knoxville with their Child. So when Williams

---

[1] Because the district court granted Williams qualified immunity after she raised the issue in a Rule 12(b)(6), Fed. R. Civ. P., motion to dismiss, for purposes of our review, we must accept the Parents' allegations as true and draw all reasonable inferences from them in their favor. *See Lotierzo v. Woman's World Med. Ctr., Inc.*, 278 F.3d 1180, 1182 (11th Cir. 2002). We therefore take the following background from the Parents' Second Amended Complaint. The actual facts may or may not be as alleged and repeated here.

returned to Anderson's mother's home the next day, she did not find them there. Instead, Anderson's mother told Williams that the Parents and Child had gone back to Knoxville. At the empty guest home, Williams found a note apparently left for her by Anderson, confirming the family had returned to Tennessee.[2]

Williams then contacted the Knox County, Tennessee, Department of Child and Family Services ("DCFS") on March 29 to obtain information about the Child. That office informed her that it had no current case involving the family and that if she had concerns about the Child's welfare, she should contact DCFS's intake department.

Williams chose a different route.

Two days after her conversation with DCFS, on March 31, 2016, Williams instead filed a Petition for Dependency[3] for the Child in the Juvenile Court of Blount County. She alleged that BCDHR had received information that the Parents were smoking

---

[2] Williams attested in the petition for dependency she later filed in Blount County, *see infra*, that Anderson had advised her during her visit the week before that he was getting ready for work and asked her if she could return the next week.

[3] A petition for dependency is an allegation that a child should be declared a "dependent," meaning generally that the child has experienced abuse or neglect, or the child does not have a proper caregiver. *See* Ala. Code § 12-15-102(8) (defining "dependent child"). Anyone over 18 who "has knowledge of the facts alleged or is informed of them and believes that they are true" may file a petition for dependency. *Id.* § 12-15-121(a).

marijuana, the Child "had not been vaccinated or taken to a doctor since he was six weeks old" (though not that the Child had any illness or immediate need for medical attention), the Parents were "swingers," and Crider suffered from various physical and mental-health conditions. Williams acknowledged in the Petition that the family no longer resided in Blount County, but she alleged that she had "received additional information that the family was avoiding [the Alabama Department of Human Resources], claiming that they had moved back to Knoxville, Tennessee, but were actually staying in Cullman[, Alabama] with the paternal grandfather[.]"

According to the Parents' allegations, Williams misrepresented the whereabouts of the Child so that the court would have jurisdiction over the Petition. To explain why the Child's location at that time and in the preceding months was important, we briefly summarize relevant Alabama law: An Alabama court generally has jurisdiction to make an initial child custody determination only if (1) Alabama is the "home state" of the child on the date the proceeding commences; or (2) Alabama was the "home state" of the child within six months before the date the proceeding commences, and the child is absent from Alabama but a parent continues to live in Alabama. Ala. Code § 30-3B-201(a)(1). Significantly, Alabama law defines "home state" as follows: "The state in which a child lived with a parent or a person acting as a parent *for at least six consecutive months immediately before the commencement of a child custody proceeding*." *Id.* § 30-3B-102(7) (emphasis added).

With that in mind, we return to the Parents' allegations. The same day Williams filed the Petition for Dependency, the Juvenile Court of Blount County entered an Order for Temporary Shelter Care and Continuation of Hearing. This Order ("Initial Order"), which is not in the record, ordered temporary physical and legal custody of the Child in BCDHR, pending a hearing on April 1, 2016. But April 1 came and went without a hearing.

Instead, in early April, Williams traveled to Knoxville and attempted to seize the Child from the Parents. But police in Knoxville told her that she needed a Tennessee court order to do that.

So on April 5, Williams appeared *ex parte* before a Knox County Juvenile Court judge and asked for an order enforcing the Alabama Initial Order and giving her authority to seize the Child. The Tennessee judge asked Williams if the Child had lived in Alabama for six months. Williams replied that, "as far as [her] knowledge[,] the [C]hild did."

We pause briefly to explain that the Tennessee judge asked this question to determine whether the Alabama court had had jurisdiction to enter the Initial Order, which Williams sought to enforce in Tennessee. Tennessee law specifically requires that the person petitioning the court to enforce an out-of-state custody order state the basis for the out-of-state court's jurisdiction by saying "[w]hether the court that issued the determination identified the jurisdictional basis it relied upon in exercising jurisdiction and, if so, what the basis was," among other requirements. Tenn. Code § 36-6-232.

Based on Williams's representation that the Child had lived in Alabama for six months, the judge signed an Attachment Pro Corpus Order. That allowed Williams to seize the Child from the Parents in Tennessee, which she did. Then Williams took the Child to Alabama. There the Child remained for over a year in foster care, until December 2017, when the Child was placed with Crider's parents in Tennessee. Meanwhile, the Petition for Dependency filed by Williams was dismissed in May 2019.

The Parents, along with Crider's parents, filed suit in October 2020 against Williams. They alleged (1) a claim under § 1983 for violating the Parents' Fourteenth Amendment procedural due-process rights by depriving them of "care, custody, control, and religious upbringing of their child" without due process; (2) a claim under §1983 for the constitutional tort of malicious prosecution under the Fourth Amendment;[4] (3) malicious prosecution under Alabama law; and (4) abuse of process under Alabama law.

The district court dismissed Crider's parents from the suit for lack of standing (a holding the Parents do not appeal), dismissed the Parents' § 1983 claims based on qualified immunity, and ostensibly declined to exercise supplemental jurisdiction over the state-law claims.

---

[4] While the Parents did not explicitly plead a Fourth Amendment claim, their allegations can reasonably be read as pleading a § 1983 malicious-prosecution claim, which the district court did. The parties also litigated such a claim, so we will address it.

## II.

We review de novo a district court's order of dismissal, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Mesa Valderrama v. United States*, 417 F.3d 1189, 1194 (11th Cir. 2005).

We review a district court's decision to decline supplemental jurisdiction for abuse of discretion. *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006). But we review de novo whether the district court had original jurisdiction over those claims, thereby obviating the need to determine supplemental jurisdiction. *See McElmurray v. Consol. Gov't*, 501 F.3d 1244, 1250 (11th Cir. 2007).

## III.

On appeal, the Parents argue that Williams is not entitled to qualified immunity on their federal claims and that the district court was wrong to decline supplemental jurisdiction over their state-law claims because the court enjoyed original diversity jurisdiction over the claims. Williams argues for the first time on appeal that she is entitled to Eleventh Amendment immunity. We begin there.

### A.    Eleventh Amendment Immunity

The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any

Foreign State." U.S. Const. amend. XI. It insulates a state from suit brought by individuals in federal court unless the state either consents to suit or waives its Eleventh Amendment immunity. *Stevens v. Gay*, 864 F.2d 113, 114 (11th Cir. 1989). The Eleventh Amendment also bars suits for damages against state officials acting in their official capacities when the state is the real party in interest. *Id.* Because the application of the Eleventh Amendment deprives the Court of jurisdiction, the immunity can be raised for the first time on appeal. *Doe v. Moore*, 410 F.3d 1337, 1349 (11th Cir. 2005).

Williams argues that the Parents have sued her in her official capacity because the complaint failed to specify in which capacity Williams was sued and because Williams undertook, in her official capacity, the actions about which the Parents complain. Based on this theory, Williams asserts that she is entitled to Eleventh Amendment immunity. For their part, the Parents argue that they have sued Williams in her individual capacity only and that their suit is not one against the state.

Williams cites Seventh Circuit precedent for the proposition that a "suit against a state official which does not indicate whether the official is sued in his or her official or individual capacity will be construed as a suit against the official in his or her official capacity and therefore barred by the Eleventh Amendment if damages are sought." Defendant-Appellee's Br. at 12 (citing *Yeksigian v. Nappi*, 900 F.2d 101 (7th Cir. 1990) and *Meadows v. Indiana*, 854 F.2d 1068 (7th Cir. 1988)).

But even if that's an accurate statement of Seventh Circuit precedent, we have a different rule. And our prior-precedent rule requires us to apply our own rule. See *Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018).

We have explained that "[w]hen it is not clear in which capacity the defendants are sued, the course of proceedings typically indicates the nature of the liability sought to be imposed." *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008) (citation and quotation marks omitted). When we consider the course of proceedings, we account for factors like "the nature of [the] plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, *particularly claims of qualified immunity which serve as an indicator that the defendant had actual knowledge of the potential for individual liability.*" *Id.* (emphasis added). Ensuring that the defendant gets "sufficient notice" about the capacity in which she is sued is our "main concern." *Id.*

Here, even though the Parents did not specify in their complaint the capacity in which they were suing Williams, Williams raised the defense of qualified immunity. The qualified-immunity defense is available to only state officers sued in their individual capacity. So Williams's invocation of that defense shows that she had sufficient notice that she was being sued in her individual capacity. *See id.*

We are also unpersuaded by Williams's argument that the Parents necessarily sued her in her official capacity because the

Parents complained about actions Williams took in her official capacity. Section 1983 provides a cause of action for deprivations caused by officials acting "under color of law." *See* 42 U.S.C. § 1983; *see also Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001) ("A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state."). So under § 1983, the Parents can state a claim only if they complain of "official" acts that Williams took. As the Supreme Court has explained, there is a difference between "the capacity in which the state officer is sued, [and] the capacity in which the officer inflicts the alleged injury." *Hafer v. Melo*, 502 U.S. 21, 26 (1991). Just because an officer inflicts an injury in her official capacity does not mean that any suit brought against her for that injury must be considered a suit against her in her official capacity. *See id.* Just like the defendant's theory that the Supreme Court rejected in *Hafer*, Williams's "theory would absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling governmental responsibilities." *Id.* at 28.

We hold that Williams is not entitled to Eleventh Amendment immunity. The district court had—and this Court has—jurisdiction.

## B. Qualified Immunity

Title 42 U.S.C. § 1983 provides a cause of action against a person acting under color of state law when that person deprives another of a federal statutory or constitutional right. But government officials performing "discretionary functions" are entitled to

qualified immunity from § 1983 claims "unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  To overcome qualified immunity, the plaintiff must show both that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021).

Our analysis proceeds in two parts.  First, we discuss whether the Parents have pled sufficient allegations that, if true, could establish that Williams violated their constitutional rights—under the Fourteenth and Fourth Amendments.  Second, because we conclude they did, we consider whether the rights violated were clearly established when Williams allegedly violated them.

### 1.    Williams violated the Parents' constitutional rights.

Here, the Parents have successfully pled violations of both their Fourteenth Amendment procedural-due-process rights and their Fourth Amendment right to be free from malicious prosecution.  We take each in turn.

### a.    *Procedural Due Process*

First, the Parents pled that Williams violated their procedural-due-process rights under the Fourteenth Amendment.  A violation of procedural due process may support a suit under § 1983. *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013).  The

Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Parents have a "constitutionally protected liberty interest in the care, custody and management of their children." *Doe v. Kearney*, 329 F.3d 1286, 1293 (11th Cir. 2003); *see also Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). So parents cannot be deprived of the liberty interest in the care, custody, and management of their children without due process of law. *See Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982) ("[P]ersons faced with forced dissolution of their parental rights have a . . . critical need for procedural protections . . . .").

The Parents sufficiently pled that they were deprived of the care, custody, and management of the Child without due process of law. According to their allegations, the Parents were deprived of custody of their Child for almost two years. And that deprivation was possible only because of Williams's alleged lies about jurisdictional facts to courts in two states. Due process of law may be lacking when proceedings are based on false statements. *See, e.g., Johnston v. Borders*, 36 F.4th 1254, 1272 (11th Cir. 2022) (concluding that employee's allegations that she was fired because of false statements about her could state a procedural-due-process claim); *Brown v. Wainwright*, 785 F.2d 1457, 1458 (11th Cir. 1986) (finding a procedural-due-process violation when prosecutor

knowingly allowed false testimony at trial and relied on it in closing argument).

If the Parents' allegations are accurate—that Williams lied to courts in two states to allow those courts to incorrectly believe they had jurisdiction to order that the Child be taken from them— the Child was removed from the Parents based on Williams's false statements. That action constitutes an "interference" with the Parents' "liberty interests" in the "care, custody, and management" of the Child without due process, in violation of the Fourteenth Amendment. *Maddox*, 727 F.3d at 1118–19.

### b.    Malicious Prosecution in Violation of the Fourth Amendment

The Parents also sufficiently pled that Williams violated their Fourth Amendment right to be free from malicious prosecution. We have recognized that there is a "right under the Fourth Amendment to be free from an unreasonable seizure as a result of a malicious prosecution." *Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020). To establish such a claim, the Parents "must prove both 'a violation of [their] Fourth Amendment right to be free of unreasonable seizures' and 'the elements of the common law tort of malicious prosecution.'" *Aguirre*, 965 F.3d at 1157 (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019)). Here, the Parents have done both.

We start with the Fourth Amendment violation. An unreasonable seizure in violation of the Fourth Amendment occurs when a person is seized without probable cause. *See Paez*, 915 F.3d

at 1285. And an officer who lies to obtain the requisite process to bring about the seizure does not have probable cause that the seizure is valid. *Id.* at 1287 ("Intentional or reckless material misstatements or omissions in a warrant affidavit thus could violate the Fourth Amendment."); *see also Aguirre*, 965 F.3d at 1165–66 (explaining that dispute of material fact as to whether officers lied in arrest warrant precluded summary judgment on whether probable cause supported arrest). The Parents have sufficiently pled that Williams lied (and therefore did not have probable cause) when she filed the Petition for Dependency in Alabama and enforced it in Tennessee, ultimately causing an unreasonable seizure of the Child.

At oral argument, Williams's counsel raised for the first time the argument that, taking the Parents' allegations as true, Williams violated only the Child's Fourth Amendment rights, not the Parents', so the Parents lack standing to raise the claim. We address this argument because, if Williams is correct that the Parents lack Article III standing, that would deprive us of jurisdiction. *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006).

While Williams may be correct that, generally, a "Fourth Amendment child-seizure claim belongs only to the child, not to the parent," *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012), the Parents' seizure allegations come within the context of a Fourth Amendment *malicious-prosecution* claim. To have Article III standing at this stage, then, the Parents must allege an injury in fact, causation, and redressability all connected to

Williams's alleged malicious prosecution of the Petition for Dependency and subsequent child-custody case against the Parents. *See, e.g.*, *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020).

They have alleged all three. The Parents have alleged an injury in the form of deprivation of their right to care, custody, and management of the Child, along with the pain and suffering that the time apart caused. This injury may be "intangible," *id.*, but it does not lack concreteness such that their claims do not form an Article III case or controversy. The Parents have also sufficiently alleged that Williams's alleged lies caused this injury, and they have permissibly asserted money damages would redress it. They have therefore sufficiently established Article III standing for their Fourth Amendment malicious-prosecution claim.

Whether the Parents may ultimately fail to fully prove their malicious-prosecution claim because the Child was seized instead of the Parents—an issue we do not now resolve—does not compel a different result at this point. The Fourth Amendment seizure is an element—that is, it goes to the merits—of the Parents' malicious-prosecution claim. So the "standing" that Williams argues the Parents lack is more like the type of Fourth Amendment "standing" that we and the Supreme Court have explicitly distinguished from Article III standing. *See United States v. Ross*, 963 F.3d 1056, 1057 (11th Cir. 2020) (en banc); *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). Fourth Amendment "standing" "is not distinct

from the merits," *Byrd*, 138 S. Ct. at 1530, is not jurisdictional, and can therefore be waived. *Ross*, 963 F.3d at 1066.

And Williams waived the merits issue here. We have repeatedly declined to entertain arguments raised for the first time on appeal, especially when they are raised only at oral argument. *See, e.g.*, *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (collecting cases); *United States v. Levy*, 379 F.3d 1241, 1242 (11th Cir. 2004) (refusing to "entertain new issue" when party did not "timely raise it in his initial brief on appeal"). Here, at oral argument, the Parents asserted their intention to replead upon remand to bring a Fourth Amendment claim on the Child's behalf. We leave to be resolved on remand whether such an amendment is necessary or warranted.

Williams argues that no constitutional violation occurred— under either the Fourteenth or Fourth Amendments—because, even taking the Parents' allegations as true, Williams lied about jurisdictional facts only, not about her basis to believe that it was necessary to remove the Child from the Parents. Neither our caselaw nor logic provides a basis for such an arbitrary distinction when a lie in either category caused the same result: the unlawful removal of the Child from the Parents. Williams also identifies no reason why the difference matters. Indeed, it doesn't. The Child could not have been ordered taken if the Tennessee court lacked jurisdiction. Nor is this just a theoretical matter. The Tennessee judge's question about the Child's length of residence in Alabama shows that the Tennessee judge wouldn't have issued the Attachment Pro

Corpus Order had Williams truthfully answered his question about the Child's length of residence in Alabama.

"[J]urisdiction refers to a court's inherent power to hear a case[.]" *Pro. Ins. Corp. v. Sutherland*, 700 So. 2d 347, 351 (Ala. 1997). And both Alabama and Tennessee have strict rules on when their courts have jurisdiction to institute child-dependency proceedings. *See, e.g.*, Ala. Code § 30-3B-201; Tenn. Code § 36-6-216. A proceeding maintained in contravention of those jurisdictional rules because of false statements to the court isn't less procedurally unfair to parents than one where someone has lied about substantive facts. In both instances, parents have been deprived of the processes set out in the states' statutes and cannot rely on them. So there is no distinction for due-process or probable-cause purposes between lying about jurisdictional facts and lying about substantive facts. Either can result in a constitutional violation when the outcome is the deprivation of a parent's custody of her child.

The complaint also sufficiently alleges facts that would establish a malicious-prosecution claim. The elements of a malicious-prosecution claim are (1) an action or proceeding instituted without probable cause; (2) where "the 'motive in instituting' the suit 'was malicious'"; and (3) in which there was an acquittal or discharge of the accusation. *Thompson v. Clark*, 142 S. Ct. 1332, 1338 (2022). The Supreme Court has noted that "malicious" "was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice." *Id.* at 1338.

21-13797                Opinion of the Court                19

The Parents alleged facts that, if proven, would support each of these elements. First, Williams instituted the Petition for Dependency in Alabama and then continued the child-welfare case by enforcing the Initial Order in Tennessee. Second, according to the allegations, she did so with malice and without probable cause (as we have discussed) because she lied to the court so it believed it had jurisdiction when it allegedly did not.[5] *See Grider v. City of Auburn*, 618 F.3d 1240, 1258–59 (11th Cir. 2010) (explaining that under Alabama law, intentional acts like fabricating evidence can satisfy the malice element); *see also Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 833 (Ala. 1999) ("[A] a reckless act taken by one without information leading to a bona fide belief justifies a finding of an absence of probable cause, from which malice can be inferred."). Third, the proceeding ultimately terminated in the Parents' favor—the Petition for Dependency was dismissed. *See Thompson*, 142 S. Ct. at 1335 (dismissal of criminal case was enough to show "favorable termination" for purposes of malicious prosecution claim); *Laskar v. Hurd*, 972 F.3d 1278, 1295 (11th Cir. 2020) (same), *cert. denied*, 142 S. Ct. 1667 (2022). These facts are enough to plead the elements of malicious prosecution.

---

[5] As the Supreme Court has not had occasion to further opine on the meaning of "a purpose other than bringing the defendant to justice," *Thompson*, 142 S. Ct. at 1338 n.3, we fill the gap with our own precedent. Under that, we look to Alabama law to determine the meaning of "malice" in this context. *See Grider v. City of Auburn*, 618 F.3d at 1256.

In short, the Parents pled sufficient allegations that, if true, could establish that Williams violated their Fourth Amendment right to be free of malicious prosecution.

### 2.    The Parents' rights were clearly established when Williams acted

Finding a constitutional violation does not end our analysis. Williams would still be entitled to qualified immunity if, at the time of Williams's challenged actions, the law had not "clearly established" those actions as violations of the Parents' constitutional rights.

A "clearly established right" is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). The Supreme Court "do[es] not require a case directly on point" for a right to be clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, immunity protects all but the plainly incompetent *or those who knowingly violate the law.*" *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551 (2017) (emphasis added) (internal quotation marks omitted).

We have "identified three different ways a plaintiff can show that the state of the law gives officials fair warning of a clearly established right." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019). First, the plaintiff can "show that a materially similar case has already been decided." *Id.* (internal quotation marks omitted).

Second, the plaintiff can "show that a broader, clearly established principle should control the novel facts of a particular situation." *Id.* (internal quotation marks omitted). Third, the plaintiff can "show that her case fits within the exception of conduct which so obviously violates [the] [C]onstitution that prior case law is unnecessary." *Id.* (internal quotation marks omitted).

We hold that the constitutional violations, both under the Fourth and Fourteenth Amendments, were clearly established. Even though we have not decided a case with facts identical to these, a "broader, clearly established principle . . . control[s] the novel facts of [each] particular situation." *Corbitt*, 929 F.3d at 1312. That relevant "broader, clearly established principle," *id.*, is that making material false statements to a court, which, by definition, are necessary to obtain process to remove a child from his parents, violates due process, and engaging in that same conduct to obtain process to seize someone violates the right to be free from unreasonable seizures and establishes the underlying federal component of a claim of the right to be free from malicious prosecution.

### a.    *Procedural Due Process*

It was clearly established at the time of Williams's alleged lies that lying to the courts about jurisdictional facts to remove the Child from the Parents would violate the Parents' procedural-due-process rights. As we've mentioned, the Supreme Court has held that parents have a strong liberty interest in the care, custody, and control of their children. Indeed, that interest is "perhaps the oldest of the fundamental liberty interests recognized by th[e Supreme]

Court." *Troxel*, 530 U.S. at 65. And because parents have that "fundamental liberty interest," the Court has made clear that official interference with it must come with "fundamentally fair procedures." *Santosky*, 455 U.S. at 753, 754.

It was also clearly established when Williams acted that there can be no "fundamentally fair procedure" when the procedure is based on false statements. The Supreme Court has long held that convictions obtained through false evidence violate the defendant's right to procedural due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). And we have held similarly in other, quasi-criminal contexts. *Monroe v. Thigpen*, 932 F.2d 1437, 1442 (11th Cir. 1991) (finding a due-process violation where parole board relied on false information to deny parole).

That Williams instituted and pursued a child-welfare proceeding against the Parents rather than a criminal case is not enough to render the principle not clearly established, given the Supreme Court's continued emphasis on the paramount importance of parents' fundamental liberty interest in raising their children. These precedents would put any reasonable child-welfare officer on notice that lying to a court to pursue child-welfare proceedings and ultimately remove the Child from the Parents for almost two years would violate the Parents' right to procedural due process. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) ("The reasoning, though not the holding of prior cases can also send the same message to reasonable officers in novel factual situations." (internal quotation marks omitted)).

b.    *Malicious Prosecution in Violation of the Fourth Amendment*

At the time of Williams's alleged lies, the law had also clearly established that lying to the courts about material facts—which, of course, lies necessary to establish the courts' jurisdiction certainly are—to seize the Child from the Parents would result in an unreasonable seizure, thereby laying the basis for a malicious-prosecution claim, provided that the elements of the state tort were established.

We have held far earlier than Williams engaged in her actions here that "the law [is] clearly established . . . that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen . . . if such false statements were necessary to the probable cause." *Aguirre*, 965 F.3d at 1168–69 (quoting *Jones v. Cannon*, 174 F.3d 1271, 1284 (11th Cir. 1999)). We have already explained why Williams's false statements about jurisdiction were "necessary" to the courts' determinations here. And though this precedent concerns an arrest affidavit in the criminal context, we think it similar enough to the Petition for Dependency here in the child-custody context that a "reasonable official would have understood that" it would apply here as well. *Mullenix*, 577 U.S. at 11. Again, the clearly established law that police officers may not lie in arrest warrants to obtain process to seize people was enough to give Williams "notice" that her actions would violate

the Parents' constitutional rights.  *See Mercado*, 407 F.3d at 1159 (11th Cir. 2005).

And the fact that the Fourth Amendment claim may ultimately belong to the Child and not the Parents is also not enough to say that the violation was not clearly established because "uncertainty as to the eventual plaintiff's standing to bring suit, no matter how objectively reasonable at the time of the conduct in question, cannot be the basis for qualified immunity." *Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 498–99 (7th Cir. 1993).  In *Triad*, the defendant public official sought to argue that he was entitled to qualified immunity because, even if he had committed intentional discrimination, it was not clearly established that a white-owned corporation could be a plaintiff in a discrimination lawsuit.  *Id.* at 498.  The court disagreed because "the appropriate focus in a qualified immunity analysis is the legality of the conduct of the public official, not the obviousness of his liability to the ultimate plaintiff." *Id.* at 499.  Put another way, the Seventh Circuit held that whether a particular plaintiff has the right to pursue a claim is a merits question, not a part of the second prong of the qualified-immunity analysis.

So too here.  That it may ultimately be the Child who has the redressable right for his unreasonable seizure, rather than the Parents, does not make Williams's alleged actions—lying to two courts to carry out the seizure—any more "reasonable." *al-Kidd*, 563 U.S. at 743.

Taking the allegations in the complaint as true, we hold that Williams is not entitled to qualified immunity at this stage.

## C.    State-law Claims

Last, the Parents argue that the district court erred by purportedly declining supplemental jurisdiction over their state-law claims when diversity-of-citizenship jurisdiction existed.  A court needs to examine whether it has supplemental jurisdiction only when it lacks original jurisdiction. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 167 (1997) ("The whole point of supplemental jurisdiction is to allow the district courts to exercise pendent jurisdiction over claims as to which original jurisdiction is lacking.").  Williams correctly conceded at oral argument that the district court did err in this regard because the Parents sufficiently pled that original diversity jurisdiction existed over their state-law claims.

In the "Jurisdiction and Venue" section of the Second Amended Complaint, the Parents pled,

> 3. Diversity is based upon all plaintiffs being resident citizens of the State of Tennessee and the defendant being a resident citizen of the State of Alabama with the amount in controversy exceeding $75,000.

Later in the complaint, they claimed $200,000 in damages.  This is enough to plead diversity-of-citizenship jurisdiction, and these allegations went uncontested by Williams. *See* 28 U.S.C. § 1332.  The district court erred by purporting to decline supplemental

jurisdiction over the claims when no option to do so existed in the first place. So we vacate and allow the district court to address Williams's potential defenses to the state-law claims in the first instance. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (remanding so the district court can consider parties' arguments in the first instance).

## IV.

In sum, we hold that Williams is not entitled to Eleventh Amendment immunity, that she is not entitled to qualified immunity at this stage of litigation, and that the district court erred by purporting to decline supplemental jurisdiction over the Parents' state-law claims.

**VACATED AND REMANDED.**